UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

NORTHERN 158 HOLDING LLC,

Plaintiff,

-against-

BROADWAY-FLUSHING HOMEOWNERS' ASSOCIATION, INC., individually and as representative of its member lot owners; RAYMOND CICCOLILLI; BARBARA CICCOLILLI; and "JOHN DOE 1" through "JOHN DOE 1,000," the foregoing fictitious names being intended to designate the record owners of lots shown on the map entitled "Map No. (1) Map of Property of Rickert Finlay Realty Co., located at Broadway, Flushing, 3rd Ward, Borough of Queens, City of New York," filed in the Queens County Clerk's Office on July 9, 1906, who are not members of Broadway-Flushing Homeowners' Association, Inc. and who claim any right to enforce the restrictive covenants recorded in Liber 2279, Page 316 against the property described herein,

Defendants.

Civil Action No.

**COMPLAINT**

Plaintiff NORTHERN 158 HOLDING LLC ("**Plaintiff**" or "**Northern 158**"), by its attorneys, Akerman LLP, for its Complaint against Defendants in the above-captioned action (this "**Action**"), alleges as follows, upon knowledge as to itself and its own acts and upon information and belief as to all other matters:

## PRELIMINARY STATEMENT

1. This Action asks the Court to free a commercial parcel fronting Northern Boulevard, a 100-foot-wide arterial in Flushing, from deed restrictions written for a horse-and-stable suburb, first imposed by a 1920 deed on lots shown on a 1906 subdivision map, restrictions that measured a house by whether it cost at least $3,000 to $5,000 to build.

2. Defendants call them the "Rickert-Finlay Covenant of 1906."

3. The 1906 map, however, imposed no restriction.

4. The restrictions first appear in deeds recorded between March 1920 and October 1922.

5. The restrictions commonly called the "Rickert-Finlay Covenants," regulate the setback of "stable[s]," prohibit "flat roof[s]," bar any "manufacturing or business purpose whatsoever" outside two designated blocks, and purport to prohibit any "two family house," "flat," or "apartment house" except in a few designated blocks, forever, with no expiration date, no modification mechanism, and no means of release.

6. For decades the Property has been used for exactly what the Covenants forbid: commercial and professional business purposes.

7. It is assessed by the City as a Tax Class 4 commercial "professional building," improved with a one-story commercial building, a billboard, and a parking lot, and zoned with a commercial overlay that Defendant Broadway-Flushing Homeowners' Association, Inc. itself requested.

8. After full public review under the Uniform Land Use Review Procedure (ULURP No. C 260171 ZMQ), the Council of the City of New York rezoned the Property to R7A/C2-4 to permit a ten-story mixed-use building with approximately 76 apartments, 19 of them permanently income-restricted, above ground-floor local retail.

9. Defendant Broadway-Flushing Homeowners' Association, Inc. opposed the rezoning and did not prevail.

10. It now threatens to invoke the 1920 restrictions to block the project.

11. New York law does not permit that result.

12. The New York Legislature has provided that no restriction on the use of land created by covenant shall be enforced by injunction, or declared or determined to be enforceable,

where "the restriction is of no actual and substantial benefit to the persons seeking its enforcement . . . either because the purpose of the restriction has already been accomplished or, by reason of changed conditions or other cause, its purpose is not capable of accomplishment, or for any other reason." RPAPL 1951(1).

13. The public record of the rezoning confirms the point.

14. BFHA's Treasurer, Maria Becce, told the City Planning Commission that the commercial stores along Northern Boulevard are "fine," that the deed restrictions "do not cover every one of" the properties in the area, and that whether the restriction is "still viable" depends on "how much of the neighborhood had actually been violated."

15. The Treasurer also told the Commission that "[t]his is not a neighborhood that is screaming for affordable housing."

16. The Chair of the City Planning Commission observed on the record that "some covenants have ultimately not been enforceable, including because some were exclusionary in nature."

17. Federal law does not permit it either. The Fair Housing Act makes it unlawful to "otherwise make unavailable or deny" a dwelling because of race, color, or national origin, 42 U.S.C. § 3604(a), and that prohibition reaches facially neutral practices that actually or predictably cause a disparate impact or perpetuate segregated housing patterns. 24 C.F.R. § 100.500(a).

18. A century-old private ban on every "flat" and "apartment house," wielded to stop the only multifamily, mixed-income rental housing approved for this part of Flushing, is such a practice.

19. Plaintiff therefore seeks (a) a declaration under 42 U.S.C. § 3613 and 28 U.S.C. § 2201 that Defendants' enforcement of the Covenants against the Project would violate the Fair

Housing Act, and an injunction against it; and (b) under this Court's supplemental jurisdiction, a declaration that the Covenants are obsolete, abandoned, inapplicable, and unenforceable as applied to the Property, extinguishment under RPAPL 1951(2), and a judgment quieting title under RPAPL article 15.

## THE PARTIES

20. Plaintiff Northern 158 Holding LLC is a New York limited liability company, formed by filing Articles of Organization with the New York Department of State on January 14, 2025, with its principal place of business in Queens County.

21. Plaintiff is the fee simple owner of the real property known as 158-06 Northern Boulevard, Flushing, New York 11358, designated on the Queens County Tax Map as Block 5277, Lot 16 (the "**Property**" or "**Lot 16**").

22. Plaintiff's principal, Xiao Jun Chen, contracted to purchase the Property from Northern Boulevard Associates, LLC under an Agreement of Purchase and Sale dated as of January 13, 2025 (the "**Contract**"), for an all-cash purchase price of $6,378,000. Plaintiff acquired title by deed transfer from Northern Boulevard Associates, LLC dated May 20, 2025.

23. Defendant Broadway-Flushing Homeowners' Association, Inc. ("**BFHA**") is, upon information and belief, a domestic not-for-profit corporation with a mailing address at P.O. Box 580024, Flushing, New York 11358-0031.

24. BFHA states that it was founded in January 1964. It has described itself both as representing "over 1,551 homeowners" and as having "more than 500 members."

25. BFHA is not the grantor, a grantee, or an assignee of the grantor under any instrument in the Property's chain of title.

26. BFHA acts through, among others, its President, George Zbravos, and its Treasurer, Maria R. Becce, and has retained Paul D. Graziano of Associated Cultural Resource Consultants as its "longtime land use, zoning and historic preservation consultant."

27. In a letter to the City Council dated August 12, 2026, signed by Mr. Zbravos, BFHA stated that its "main purpose . . . is to defend and enforce the Rickert-Finlay covenant."

28. Upon information and belief, in or about July 2026, counsel acting for or with BFHA ordered a covenant-and-restriction search of Block 5277, Lots 1, 16, and 25, which BFHA then submitted to the City Council with its written testimony.

29. Plaintiff owns only Lot 16.

30. Lots 1 and 25, which are owned by others, were included within the proposed rezoning area, upon information and belief at the encouragement of the Department of City Planning to support additional housing; Plaintiff holds no interest in either lot, and the Council removed Lot 1 from the rezoning.

31. BFHA's own published boundary map, captioned "B'WAY-FLUSHING HOMEOWNERS' ASSOC.," depicts the Association's territory as bounded by 155th Street on the west, 170th Street on the east, 29th and 32nd Avenues on the north, and Northern Boulevard and Crocheron Avenue on the south.

32. The Property lies on the southerly side of Northern Boulevard.

33. Every vesting instrument in its chain of title, from the 1960 Agreement (defined below) through the 1995 deed recorded at Reel 4225, Page 1974, and the Schedule A description in Plaintiff's title commitment, begins "at the corner formed by the intersection of the Southerly side of Northern Boulevard, 100 feet wide with the easterly side of 158th Street."

34. The Property therefore lies outside the territory BFHA itself identifies as its own.

35. By contrast, BFHA describes the 1906 tract as running "between 33rd Avenue to the north and Depot Road to the south," and BFHA's consultant describes the covenant area as including "the residential areas north and south of Northern Boulevard."

36. BFHA intends to enforce the Covenants to an area that extends beyond the territory its own map assigns to it.

37. BFHA is sued individually and in its representative capacity on behalf of its member lot owners.

38. BFHA has itself asserted, and the Second Department has held, that it has standing to enforce the Rickert-Finlay Covenants on behalf of the owners within its community, because it was "formed as a convenient instrument by which the property owners could advance their common interests" and has "a substantial identification with" them. *Broadway-Flushing Homeowners' Ass'n v. Dilluvio*, 97 A.D.3d 614, 616, 948 N.Y.S.2d 386, 389 (2d Dep't 2012) (quoting *Westmoreland Ass'n v. W. Cutter Ests., Ltd.*, 174 A.D.2d 144, 151 (2d Dep't 1992)), *lv. denied*, 21 N.Y.3d 856, 991 N.E.2d 216 (2013).

39. BFHA describes its "main purpose" as to "defend and enforce the Rickert-Finlay covenant," and it has prepared to sue Plaintiff to enforce the Covenants for the benefit of its members.

40. Having invoked that representative capacity to enforce the Covenants, BFHA is the proper party to defend, on behalf of its members, the enforceability of the Covenants against the Property.

41. The claims asserted here present common questions of law and fact concerning a single recorded instrument and a single parcel, and neither the claims nor the relief requested requires the individual participation of BFHA's members.

42. Plaintiff therefore seeks a judgment binding BFHA's member lot owners through BFHA, and the Court has personal jurisdiction over those members, each of whom, upon information and belief, resides in or owns real property in Queens County, through BFHA's appearance in its representative capacity.

43. To the extent the Court determines that any member is not bound through BFHA, Plaintiff alleges in the alternative that BFHA's members constitute a defendant class under Fed. R. Civ. P. 23(a) and 23(b)(1)(A), (b)(1)(B), and (b)(2), with BFHA as class representative, and Plaintiff will move for certification and for such notice as the Court directs.

44. BFHA's representative posture is consistent with the settled New York principle that an association may sue or be sued on behalf of a group where it is "an appropriate one to act as the representative of the group whose rights it is asserting." *Dilluvio*, 97 A.D.3d at 616 (internal quotation marks omitted). Neither the claims asserted nor the relief requested here requires the participation of individual members.

45. BFHA has publicly described itself as the "organization representing the neighborhood" through which "private legal action" to enforce the Covenants proceeds.

46. Having claimed that role to sue, BFHA cannot disclaim it to avoid being bound.

47. Defendants Raymond Ciccolilli and Barbara Ciccolilli (the "**Ciccolillis**") are individuals who, upon information and belief, own and reside at 40-19 158th Street, Flushing, New York 11358, designated on the Tax Map as Block 5277, Lot 14 ("**Tax Lot 14**"), and who claim a right to enforce the Rickert-Finlay Covenants against the Property.

48. The Ciccolillis' parcel at 40-19 158th Street adjoins the Property.

49. Mrs. Ciccolilli testified before the City Planning Commission that she lives "next door" and moved to the area "nearly 50 years ago," and Mr. Ciccolilli wrote to the City Council that he has lived at that address since 1977.

50. In February 1960, the then-owners of 40-19 158th Street, Bertram S. Kassan and Mary Kassan, executed the Zoning Change Agreement described in Part B below, consenting to the commercial use of the Property and withdrawing their objections to its commercial rezoning.

51. Defendants "John Doe 1" through "John Doe 1,000" (the "**Non-Member Doe Defendants**") are the record owners of lots shown on the 1906 Map (defined below) who are not members of BFHA and who claim, or may claim, a right to enforce the Rickert-Finlay Covenants against the Property.

52. Owners who are BFHA members are not separately named, because they are before the Court through BFHA in its representative capacity.

53. The Non-Member Doe Defendants are not represented by BFHA, and BFHA's bylaws do not bind them.

54. Their identities will be ascertained from the public records by comparing a tract-wide ownership search against BFHA's membership roll.

55. They are persons who must be joined so that complete relief may be accorded and so that persons who might be inequitably affected by the judgment are before the Court. Fed. R. Civ. P. 19(a), 20(a)(2); CPLR 1001(a).

56. If joinder of any of them is not feasible, the Court may proceed in their absence under Fed. R. Civ. P. 19(b) and CPLR 1001(b), because a judgment rendered with BFHA and the identified owners before the Court will adequately protect their interests.

57. RPAPL 1501(1) separately authorizes this action against "any other person, known

or unknown."

58. In the alternative, the Non-Member Doe Defendants constitute a defendant class under Fed. R. Civ. P. 23(a) and 23(b)(1) and (b)(2), and under CPLR 901 and 1002 to the extent applicable, represented by the Ciccolillis, who claim the same right to enforce the Covenants.

59. The Non-Member Doe Defendants are named on the state-law causes of action only.

60. Plaintiff will seek leave to substitute their true names upon identification and such orders regarding service as may be required under Fed. R. Civ. P. 4(e)(1).

## JURISDICTION AND VENUE

61. This Court has subject-matter jurisdiction over the First Cause of Action under 28 U.S.C. § 1331, because it arises under the Fair Housing Act, 42 U.S.C. §§ 3601 et seq., and under 42 U.S.C. § 3613(a), which authorizes an aggrieved person to commence a civil action in an appropriate District.

62. This Court has supplemental jurisdiction over the Second through Tenth Causes of Action under 28 U.S.C. § 1367(a), because they concern the same Covenants, the same Property, the same Project, and the same threatened enforcement, and therefore form part of the same case or controversy under Article III.

63. This Court may grant declaratory and further necessary or proper relief under 28 U.S.C. §§ 2201 and 2202, and injunctive relief under 42 U.S.C. § 3613(c)(1).

64. This Court has personal jurisdiction over each Defendant under Fed. R. Civ. P. 4(k)(1)(A) and CPLR 301, because each Defendant is organized under the laws of, domiciled in, or owns real property in the State of New York. BFHA's member lot owners are before the Court through BFHA in its representative capacity, as alleged above in the description of BFHA under

"The Parties," and in the alternative through a defendant class under Fed. R. Civ. P. 23. Jurisdiction over the Property itself, situated in Queens County, supports the in rem relief sought under RPAPL article 15 and RPAPL 1951.

65. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2), because all Defendants reside in this District and the Property that is the subject of this action is situated in Queens County, within this District.

66. A justiciable controversy exists. By letter dated May 11, 2026 to the Director of the Department of City Planning, BFHA asserted that the Property "is subject to the Rickert-Finlay Covenant deed restriction" and that approval of the rezoning "would . . . create an immediate basis for litigation."

67. Upon information and belief, BFHA and the Ciccolillis, through counsel, have prepared a verified complaint and motion papers seeking a temporary restraining order, preliminary and permanent injunctions, and a declaration that the Covenants bar Plaintiff's development.

## FACTUAL ALLEGATIONS

### A. The 1906 Map and the 1920 Deed

68. On July 9, 1906, a map entitled "Map No. (1) Map of Property of Rickert Finlay Realty Co., located at Broadway, Flushing, 3rd Ward, Borough of Queens, City of New York, Surveyed by R. H. Bethel, Surveyor" was filed in the Queens County Clerk's Office as Map No. 1039 (the "**1906 Map**").

69. Upon information and belief, the 1906 Map does not itself contain or impose any restriction on the use of the lots shown on it.

70. BFHA's August 12, 2026 letter states that the Covenants appear in "deeds recorded between March 1920 and October 1922."

71. The instruments BFHA itself submitted to the City Council confirm that Rickert-Brown Realty Corporation imposed the Covenants lot by lot, through separate deeds to separate grantees, over at least two and one-half years.

72. These include a deed to Harry O. Brown and Edith E. Brown dated March 13, 1920 (Liber 2273, Page 387); the 1920 Deed to Samuel S. Toback; a deed to Manuel C. DeLeon and Juliette M. DeLeon dated May 27, 1921, conveying Lots 26, 27, and 28 in Block 7 (Liber 2348, Page 107); and a deed recorded October 27, 1922 (Liber 2451, Page 165).

73. Each of these was made fourteen to sixteen years after the 1906 Map was filed.

74. By indenture dated April 19, 1920, Rickert-Brown Realty Corporation, a corporation distinct from Rickert-Finlay Realty Co., the entity that filed the 1906 Map, conveyed Lots 13 through 20 in Block 7 of the 1906 Map to Samuel S. Toback, subject to an existing mortgage.

75. The indenture was recorded in the Office of the Register of Queens County on April 20, 1920, in Liber 2279, Page 316 (the "**<u>1920 Deed</u>**").

76. The 1920 Deed contains twenty-eight numbered covenants (the "**<u>Covenants</u>**"), including the following:

(a) Covenants First through Fifth, which prohibit any "house" in various areas "costing less than" $3,000, $4,000, or $5,000;

(b) Covenant Sixth, which provides that "[n]o lot or building thereon shall be used for any manufacturing or business purpose whatsoever, except in blocks 20 and 26," defined as the "business section";

(c) Covenant Sixteenth, which provides that "[n]o building of the character known as a 'two family house' flat or apartment house, shall be erected except as provided in paragraph 26";

(d) Covenant Seventeenth, which prohibits any building having a "flat roof" except in the "business section";

(e) Covenants Twenty-First through Twenty-Third, which regulate the setback of any "stable or other outbuilding";

(f) Covenant Twenty-Sixth, which permits apartment houses "east of the centre line of Blocks 21 and 22 and West of the centre line of Blocks 27 and 28," on conditions including that no single apartment house cost "less than $4000," none have a "flat roof," and none have "more than 2 apartments on a floor";

(g) Covenant Twenty-Seventh, which provides that "[t]he above restrictions do not apply to certain plots, included within the limits herein mentioned, but not owned or controlled by the party of the first part"; and

(h) Covenant Twenty-Eighth, which states that Covenants First through Twenty-Seventh "are covenants running with the lands and shall bind the party of the second part and the heirs or successors, assigns and grantees of the party of the second part."

77. The Covenants contain no expiration date, no renewal mechanism, no procedure for amendment or release, and no grant of enforcement rights to any homeowners' or civic association.

78. BFHA did not come into existence until 1964, forty-four years after the 1920 Deed.

79. Covenant Twenty-Eighth binds the grantee and the grantee's successors. It does not identify any dominant estate, any class of beneficiaries, or any intent that the owners of other lots, much less a later-formed civic association, may enforce the restrictions.

80. Covenant Twenty-Seventh expressly acknowledges that, within the limits of the purportedly restricted area, there were plots "not owned or controlled" by the grantor to which the restrictions "do not apply."

81. On their own terms, therefore, the Covenants were not imposed uniformly throughout the tract.

**B. The Property and Its Long-Standing Commercial Character**

82. The Property lies at the southeast corner of Northern Boulevard (100 feet wide) and 158th Street (60 feet wide).

83. The Property is described in Plaintiff's title as Lots 13, 14, and 15 and parts of Lots 16 through 20 in Block 7 of the 1906 Map, with approximately 105.112 feet of frontage on Northern Boulevard and approximately 156.70 feet of frontage on 158th Street.

84. The Property lies in Block 7 of the 1906 Map. It is not within Blocks 20 or 26, the "business section" of Covenant Sixth, and it is not within the area described in Covenant Twenty-Sixth.

85. As shown on the survey of All County Land Surveyor PC dated February 2025, the Property was then improved with a commercial stucco building fronting directly on Northern Boulevard, with a stucco overhang projecting toward the boulevard and a metal billboard affixed to its easterly face, together with an asphalt parking lot, a gravel driveway and parking area, a handicap lift, and a one-story frame garage near the southerly line.

86. The City Planning Commission describes the building as a "two-story medical office building with unenclosed parking," last operated as a dialysis center.

87. Upon information and belief, the dialysis center ceased operations in or about the 2020's for reasons unrelated to Plaintiff, the building stood vacant, and the seller marketed the Property as a development site.

88. The Contract required delivery of the building vacant (Contract § 5.4.6).

89. Upon information and belief, no offer was made to purchase the Property for development as a single-family house.

90. Plaintiff did not create the conditions that ended the Property's medical use.

91. The building was demolished in 2025, and the Property is now vacant and cleared for development.

92. The New York City Department of Finance classifies the Property in Tax Class 4 (commercial) and in Building Class 07, "Professional Buildings/Stand Alone Funeral Homes."

93. The Property's 2024/2025 final assessed value was $3,220,200 (actual) and $2,948,940 (transitional).

94. The City's records confirm the Property's decades of commercial use.

95. Certificate of Occupancy No. 400565982, issued by the Department of Buildings on July 14, 1999, describes a three-story building on a lot mapped C1-2 within an R-4 district, containing "Exam & Treatment Rms.," "X-Ray & Radiology Rms.," offices, and "Accessory Parking for (16) Motor Vehicles."

96. In 2008 and 2009, the members of Northern Boulevard Associates, LLC obtained permits for interior renovation, new rooftop dunnage, and new air-conditioning equipment, each filed as a commercial building with "no change in use."

97. In 2019, the Department of Buildings issued a permit for the "interior renovation of an existing medical office" on behalf of Medical Arts Radiological Group, at an estimated cost of $106,000.

98. The Department of Buildings classifies the Property as a "Commercial Property," and the Department of Finance classifies the building as "O7-Office Buildings."

99. Before the medical use, the Property was, upon information and belief, operated by the Burburan family as a restaurant and catering establishment known as "Burburan's Towne House."

100. Fire Department records issued to that establishment in 1987 and 1993 remain indexed against Block 5277, Lot 16. The Property's use as a restaurant and catering establishment is the use the 1960 Agreement contemplated.

101. From 1995 until 2025, the Property was owned by Northern Boulevard Associates, LLC, whose members were physicians.

102. Upon information and belief, during that period, the Property was operated as a medical and professional office building. In or about 2008, the Property's then-owner Northern Boulevard Associates, LLC amended its operating agreement to provide for the "Expansion of Building" and related capital contributions.

103. Each such use was a "business purpose" prohibited by Covenant Sixth outside Blocks 20 and 26.

104. The property immediately to the east of the Property, designated on the Tax Map as Block 5277, Lot 25 ("**Tax Lot 25**"), is an approximately 17,945-square-foot corner lot improved with "Galaxy Plaza," a multi-level commercial shopping center with professional offices, restaurants, and upwards of two dozen small-business tenants, together with a sub-level parking area.

105. The Galaxy Plaza property sits on the common boundary line with the Property.

106. Tax Lot 25 incorporates former Tax Lots 25, 31, and 33 and, upon information and belief, map lots in Block 7 that Rickert-Brown Realty Corporation conveyed subject to the same Covenants (Liber 2273, Page 387; Liber 2348, Page 107).

107. Galaxy Plaza was built openly and with the City's involvement.

108. Galaxy Plaza's owner, Lore Associates, Inc., recorded a Waiver of Legal Grade for 158-14 Northern Boulevard on August 5, 1988 (Reel 2652, Page 1979) in connection with its

application for a certificate of occupancy, and granted New York Telephone Company an easement on March 16, 1988, depicting a sub-level parking area, cellar, and two-story building (Reel 2886, Page 1973).

109. On April 11, 1990, the New York City Department of Finance issued a Final Certificate of Eligibility granting Industrial and Commercial Incentive Program benefits “for Commercial construction work” on 59,370 square feet of that building (Reel 3007, Page 2464).

110. Upon information and belief, neither BFHA nor any lot owner sought to enjoin Galaxy Plaza’s construction or use.

111. Before the rezoning described below, the Property was mapped R5B with a C1-2 commercial overlay along Northern Boulevard.

112. BFHA’s own published history admits that BFHA “applied for a zoning change to make the zoning along 5 blocks of Northern Boulevard conform to their actual development: 100 feet commercial, and not 150 feet,” and that the earlier “mis-zoning had caused the violation of the Covenant which led to the 1988 case.”

113. BFHA thus acknowledged that the first 100 feet of Northern Boulevard frontage along those five blocks was, in actual fact, developed commercially.

114. BFHA sought to have that commercial development recognized in the zoning rather than abated under the Covenants.

115. BFHA’s published history further acknowledges that “courts may be less amenable in areas where violations of old covenants have already been allowed to occur.”

116. The Property’s own chain of title records that its owners and neighbors treated it as commercial frontage.

117. By a Zoning Change Agreement, dated February 1960 and recorded February 19, 1960 in Liber 7224, Page 661 (the "**1960 Agreement**"), the Property's then-owner, George A. Burburan, and the record owners of the adjoining residential properties agreed to the Property's rezoning "from Local Retail and Residence Districts to Retail District."

118. The adjoining owners were Dennis J. and Rose Patricia Regan (40-11 159th Street), Kathleen R. Lee (40-20 159th Street), Edward M. and Rosemary A. Jordan (40-16 159th Street), Bertram S. and Mary Kassan (40-19 158th Street, now the Ciccolillis' parcel), and Ralph T. and Lois W. Trudel (40-25 158th Street).

119. In the 1960 Agreement, the Property's owner covenanted that the Property would be used "as a dwelling, restaurant, bar, cabaret and catering, with parking establishment as permitted in a Retail District."

120. The parties declared the instrument "a covenant running with the land . . . binding upon the successors and assigns of the parties hereto." By a separate instrument recorded with it (Liber 7224, Page 665), each adjoining owner agreed and consented "that their objections are withdrawn" to the proposed change of zoning "covering property on the south side of Northern Boulevard between 158th and 159th Streets."

121. The adjoining owners thus consented in writing, in a recorded instrument, to restaurant, bar, cabaret, catering, and parking uses that Covenant Sixth forbids.

122. Northern Boulevard, New York State Route 25A, is a multi-lane arterial highway carrying regional vehicular and bus traffic. The 1920 Deed describes it as "Broadway."

123. Upon information and belief, it has since been widened from its original width to its present 100-foot width and six lanes.

124. Within the 1906 Map area, its frontage, including the Property and Tax Lot 25, consists of commercial and professional buildings, parking, and outdoor advertising, uses that Covenant Sixth prohibits outside Blocks 20 and 26.

125. The City Planning Commission found that Northern Boulevard is “a wide, six-lane commercial corridor,” and that the area surrounding the Property is “predominantly developed with diverse commercial uses along both north and south sides of Northern Boulevard including many ethnic supermarkets, restaurants, and local retail.”

126. The City Planning Commission also found that pre-war multifamily apartment buildings of four to six stories stand between 156th Street and Sanford Avenue and on Station Road between 157th and 159th Streets, and that the area south of Northern Boulevard “is largely developed with residential uses containing all housing types including multifamily apartment buildings.”

127. BFHA’s consultant has acknowledged “a single 6-storey apartment building built a century ago at the corner of 161st Street” on Northern Boulevard within Broadway-Flushing.

128. Upon information and belief, that building, at 161-01 Northern Boulevard, three blocks east of the Property, is a six-story mixed-use building with ground-floor commercial space and apartments above, and it stands on land within the 1906 Map tract outside the Covenant Twenty-Sixth area.

129. Further west, at the corner of 153rd Street and elsewhere along Northern Boulevard, multistory apartment buildings line the corridor.

130. Upon information and belief, no single-family house fronts Northern Boulevard on the blocks adjoining the Property, and numerous commercial buildings along the frontage were built in violation of Covenant Sixth without challenge.

131. The City's own planning record has treated this very frontage as commercial for two decades.

132. In the 2005 East Flushing rezoning (C 050277 ZMQ, adopted July 11, 2005), the City Planning Commission found that Northern Boulevard "is developed with one- and two-story commercial buildings containing a mix of national chain and local stores, eating and drinking establishments and automobile-oriented businesses, as well as several four- to six-story apartment buildings," and it fixed the depth of the commercial overlay at 100 feet expressly "to match the depth of commercial development on the south side of Northern Boulevard between 157th and 159th streets"—the block on which the Property sits.

133. In the 2009 North Flushing rezoning (C 090281 ZMQ, approved April 1, 2009), the Commission mapped the new R1-2A district on 24 blocks of Broadway-Flushing, generally bounded by 32nd Avenue, Crocheron Avenue, 156th Street, and 163rd and 167th Streets, to "help protect the predominant built scale and character" of those blocks, and revised commercial overlays to "prevent the expansion of potentially incompatible commercial uses onto residential side streets."

134. Community Board 7 recommended approval by a vote of 41 to 0, and two members of BFHA testified in support.

135. The residential-character purpose BFHA now attributes to the Covenants has thus been secured by contextual zoning that BFHA itself sought.

136. In connection with the Project's environmental review, the Landmarks Preservation Commission determined by letter dated July 22, 2025 that the Property, Tax Lot 1, and Tax Lot 25 have no architectural or archaeological significance.

137. The State and National Register-listed Broadway-Flushing Historic District lies within 400 feet of, but does not include, the Property, and the Department of City Planning's Type II Memorandum describes that district as one of "almost exclusively residential use" north of the Property.

138. The Department of City Planning determined on February 26, 2026 that the rezoning was a Type II action under the City's Green Fast Track for Housing.

139. The block on which the Property sits also contains the Dar Al-Taqwa Islamic Center (Block 5277, Lot 1), a house of worship.

140. The Q13 and Q28 bus lines stop directly in front of the Property, and the Long Island Rail Road Broadway Station lies three blocks to the east. The Property lies within the City's Outer Transit Zone.

**C. The Changed Conditions of the Surrounding Area**

141. In 1920, the area around the Property was an emerging suburb of stables, outbuildings, and detached houses, whose minimum construction costs were measured in single-digit thousands of dollars.

142. Since then, conditions have changed fundamentally.

143. Every one of the following changes post-dates the 1920 Deed: (a) the transformation of Northern Boulevard into a six-lane regional commercial arterial served by bus and rail transit; (b) the adoption of the 1961 Zoning Resolution, which mapped the Property R4/C1-2 within 150 feet of Northern Boulevard, and the 1960 rezoning of the Property to a Retail District with its neighbors' written consent; (c) the commercial and professional development of the Northern Boulevard frontage within the 1906 Map area, including the Property, Galaxy Plaza on Tax Lot 25, and the frontage BFHA itself describes as "100 feet commercial"; (d) the 2005 East Flushing Rezoning (C 050277 ZMQ), adopted with BFHA's participation, which mapped

R5B/C1-2 along Northern Boulevard "to support new development of underutilized sites along Northern Boulevard"; (e) the North Flushing rezoning effective in 2009, which created contextual R1-2A zoning independently protecting the interior residential blocks; (f) the 2006 listing of Broadway-Flushing on the State and National Registers of Historic Places; (g) the City of Yes for Housing Opportunity amendments, which, according to BFHA's own consultant, now allow five-story apartment buildings as of right along this stretch of Northern Boulevard, and which the City used, according to that consultant, with this "exact location" as an illustration; (h) the City Council's approval in 2026 of an R7X district at 147-14 Northern Boulevard, about nine blocks to the west; and (i) a severe housing shortage, which is acute in Queens Community District 7.

144. Queens Community District 7 has the highest rent-burdened population in Queens and the third highest in the City.

145. Because the interior residential blocks are now protected by contextual low-density zoning and historic-register designation, any purpose the Covenants may have had in preserving the residential character of those blocks has been accomplished by other means, and that purpose cannot be advanced by restricting a commercial parcel fronting Northern Boulevard.

146. The Covenants' cost thresholds of $3,000 to $6,000, their stable and outbuilding regulations, and their limit of two apartments per floor have no meaningful application to modern construction.

147. They confirm that the Covenants' original purposes cannot be accomplished under present conditions.

**D. The Rezoning and the Project**

148. On November 25, 2025, Plaintiff filed with the New York City Department of City Planning an application for a zoning map amendment (ULURP No. C 260171 ZMQ) changing the

Property's R5B/C1-2 and R2 designations to R7A/C2-4.

149. Plaintiff filed with the application a related zoning text amendment designating a Mandatory Inclusionary Housing ("**MIH**") area (N 260172 ZRQ).

150. The application was reviewed under the City's Green Fast Track for Housing, and a Type II Memorandum issued on February 26, 2026 (CEQR No. 26DCP065Q) with an (E) designation (E-896).

151. The application was certified as complete on March 2, 2026.

152. The application underwent full public review.

153. On May 4, 2026, Queens Community Board 7 recommended disapproval of the application by a vote of 10 in favor, 26 opposed, and 2 abstaining.

154. BFHA submitted written opposition to the application dated May 11, 2026.

155. On June 5, 2026, following a May 21, 2026 hearing, the Queens Borough President recommended approval with conditions.

156. The City Planning Commission held a public hearing on June 17, 2026, and, on July 15, 2026 (Calendar No. 10), approved the application.

157. The City Planning Commission found the R7A/C2-4 district "appropriate" and concluded that the project "will integrate into the well-established land use patterns along Northern Boulevard."

158. At the June 17, 2026 hearing, the Department of City Planning's General Counsel advised the City Planning Commission that "the presence of a deed restriction or restrictive covenant is not part of the land-use consideration that is relevant to this Commission," and that "any property encumbrance is not relevant."

159. The City Planning Commission approved the application with full knowledge of BFHA's claim under the Covenants.

160. The City Council's Subcommittee on Zoning and Franchises held a public hearing on August 12, 2026.

161. The City Council's Subcommittee on Zoning and Franchises approved the application with a modification removing the southerly portion of the proposed rezoning area, including Block 5277, Lot 1 and referred it to the City Council's Committee on Land Use on September 24, 2026.

162. The City Council's Committee on Land Use adopted the recommendation of the City Council's Subcommittee on Zoning and Franchises to approve the application with the modification and referred it to the City Planning Commission for a determination that the proposed modification was not subject to additional environmental review or additional review on September 24, 2026.

163. On October 5, 2026, the City Planning Commission determined that the modification required no additional review.

164. The City Planning Commission's determination was communicated to the City Council by letter of the Chair of the City Planning Commission dated October 7, 2026.

165. The full City Council then adopted Resolution No. 673 (C 260171 ZMQ, L.U. No. 123) and Resolution No. 674 (N 260172 ZRQ, L.U. No. 124), approving the zoning map and text amendments with modifications.

166. As modified, Resolution No. 673 bounds the C2-4 district on the south by "a line 115 feet northerly of Depot Road." Both resolutions describe the Project as containing "76 dwelling units, of which 19 would be income-restricted."

167. The City Council's approval was adopted on or about October 13, 2026.

168. Plaintiff proposes to construct a ten-story mixed-use building (the "**Project**") of approximately 70,765 square feet of floor area (5.0 FAR), rising to approximately 105 feet, with approximately 9,282 square feet of ground-floor local retail, cellar parking, and electric-vehicle charging.

169. As approved by the City Planning Commission and the City Council, the Project will contain approximately 76 dwelling units, of which approximately 19 will be permanently income-restricted under MIH Option 1, at 40, 60, and 80 percent of Area Median Income.

170. As presented to the Borough President, the unit mix included two- and three-bedroom units suitable for families.

171. The Project will replace a one-story commercial building, billboard, and surface parking on a commercial arterial with new housing, including permanently affordable family-sized units, and neighborhood retail.

**E. The Chain of Title and the Absence of a Uniform Plan as to Lot 16**

172. After the 1920 Deed, title to the Property passed by deeds recorded in the Office of the City Register, Queens County, to Kate Toback (1931, Liber 3533, Page 81); Henry Psenicka (1935, Liber 3772, Page 557); Nicholas and Catherine Bulger (1946, Liber 5211, Page 324); George Burburan (1955, Liber 6775, Page 51); George Burburan, Jr. (1978, Reel 1111, Page 1162); Northern Boulevard Associates, LLC (deed dated October 27, 1995, recorded November 16, 1995, Reel 4225, Page 1974); and Plaintiff (deed dated May 20, 2025, CRFN 2025000142473).

173. The 1995 deed to Northern Boulevard Associates, LLC describes the Property solely by reference to the 1906 Map and by metes and bounds, conveys it "with the buildings and improvements thereon erected," and does not recite, incorporate, or refer to the Covenants.

Plaintiff's 2025 deed likewise describes the Property by reference to the 1906 Map and does not recite the Covenants.

174. On January 13, 2025, Plaintiff's principal, Xiao Jun Chen, purchased the Property from Northern Boulevard Associates, LLC pursuant to the Contract for an all-cash purchase price of $6,378,000.

175. The Contract permitted assignment to an entity in which Mr. Chen holds a controlling interest and control of management (Contract § 24). Plaintiff was organized the following day, January 14, 2025, and took title under that assignment.

176. The purchase closed on May 20, 2025. Plaintiff paid the $6,378,000 purchase price in full, without mortgage financing, and its owner's policy of title insurance, issued by First American Title Insurance Company through Cornerstone Land Abstract, LLC, insures title in that amount.

177. The closing statement describes the transaction as the "Purchase of a Commercial Building." The final owner's policy (Policy No. 50264836-0015382e, dated May 20, 2025) names Plaintiff as the insured.

178. Since closing, Plaintiff has invested approximately $1,000,000 in demolition, design, land-use approvals, and other predevelopment work, for a total investment in the Property of approximately $7,400,000.

179. The Contract listed the "Covenants and Restrictions in Deed in Liber 2279 Page 316" and the "Zoning Change Agreement in Liber 7224 page 661" as permitted encumbrances (Contract §§ 3.1.2, 3.1.3).

180. It conditioned acceptance of recorded covenants generally on the title company's affirmative insurance "that such covenants are not currently violated and do not prohibit the current use of the Property . . . as presently constructed and as presently used" (Contract § 3.1.1).

181. The Contract required delivery of the commercial building vacant (Contract § 5.4.6).

182. In the Contract, the seller, which had owned and operated the Property as a professional building for thirty years, represented that it had "received no written notice of any pending litigation or claim, against or concerning . . . the Property," and that, to its knowledge, there was no "pending or threatened litigation . . . against or affecting . . . title to the Real Property" (Contract §§ 15.1.6, 15.1.7).

183. Upon information and belief, no person sought to enforce the Covenants against the Property's commercial use at any time from 1995 through the closing in May 2025.

184. The 1906 Map, on which BFHA relies to establish a common plan, was filed by Rickert-Finlay Realty Co.

185. The Covenants were imposed fourteen years later by a different entity, Rickert-Brown Realty Corporation, in a deed that itself acknowledges (Covenant Twenty-Seventh) that plots within the area were not owned or controlled by that grantor and were not restricted.

186. The tax lot occupied by the Ciccolillis (Tax Lot 14) is not the same parcel as map Lot 14 in Block 7 of the 1906 Map.

187. Map Lots 13, 14, and 15 lie within the Property itself. BFHA's reliance on the Ciccolillis' parcel as having been "conveyed . . . subject to all twenty-eight Rickert-Finlay Covenants as part of the same common plan" is not supported by any instrument in Plaintiff's chain of title.

188. Upon information and belief, no deed restating the Covenants in Tax Lot 14's chain of title has been produced or identified.

189. Upon information and belief, the original conveyances of lots from the 1906 Map tract were not made under uniform restrictions.

190. Lots were conveyed at different times, by different grantor entities, and, as Covenant Twenty-Seventh confirms, some plots within the tract were not subject to the Covenants at all.

191. BFHA concedes the point. Its Treasurer testified that the deed restrictions "do not cover every one of those properties, but they cover a good portion of them," and that the Covenants are "not recognized by the City" but must be "brought and enforced in court."

192. BFHA's own consultant misdescribes the Covenants. He asserts that Covenant Twenty-Sixth "prohibits apartment buildings," when in fact Covenant Twenty-Sixth is the provision that expressly permits apartment houses.

193. BFHA's Treasurer told the Commission that "only a single-family home" could be built behind the Property, yet acknowledged that commercial use along Northern Boulevard is "fine." BFHA's own description of the restrictions is thus inconsistent, selective, and broader than their text.

**F. BFHA's Threatened Enforcement and the Cloud on Title**

194. BFHA's threatened enforcement places a cloud on Plaintiff's title, impairs Plaintiff's ability to obtain construction financing and building permits for the Project, and threatens substantial and mounting carrying costs.

195. Plaintiff's owner's policy of title insurance excepts from coverage the "Covenants and Restrictions with Setback Provisions in Liber 2279 Page 316."

196. Upon information and belief, BFHA's constitution and bylaws do not authorize it to commence litigation on behalf of non-member lot owners, BFHA's membership is not limited to owners of lots benefited by the Covenants, and BFHA's governing body has not duly authorized the enforcement action it threatens.

197. In BFHA's 2013 enforcement action, its own past President conceded under cross-examination that BFHA's Certificate of Incorporation, which he had never seen, and its Bylaws "did not specifically mention the Covenant by name." *Broadway Flushing Homeowners' Ass'n v. E. N.Y. Enters., Inc.*, 40 Misc. 3d 1220(A), 977 N.Y.S.2d 665, 2013 N.Y. Slip Op. 51243(U), at *2 (Sup. Ct. Queens Cnty. July 17, 2013).

198. BFHA's enforcement is also selective by its own account. In the same action, BFHA's past President conceded on cross-examination that "not every 'out of compliance structure' resulted in legal action," and that BFHA, citing limited resources, "had to choose which violations" to pursue according to its view of neighborhood "esthetics." *Id.* at *1.

199. BFHA's consultant testified that BFHA promoted the Covenants to prospective purchasers as "a selling point to those prospective purchasers who were concerned that new developments might change the nature of the area." *Id.* at *3.

200. The same testimony placed approximately 1,305 households within BFHA's boundaries but only approximately 541 within the Covenant area. *Id.* at *1, *2.

201. BFHA is therefore a representative of a community most of whose members are not benefited by the Covenants at all.

202. BFHA describes its founding purpose as "protecting and preserving the newly adopted Zoning Resolution of 1961 (R1-R2) and the Rickert-Finlay Covenant of 1906."

203. The zoning-protection purpose has been accomplished or superseded by the City's contextual zoning of the area and by the City Council's legislative rezoning of the Property.

204. BFHA's own sworn public testimony confirms both the limits of the Covenants and BFHA's role as the neighborhood's enforcement vehicle.

205. On September 16, 2015, BFHA's then-Second Vice President, Maria Becce—now its Treasurer—testified under oath before the City Council's Committee on Housing and Buildings on Int. No. 280 that Broadway-Flushing "comprises more than 1,300 homes and approximately one-half of them have a restricted deed"; that the Association's boundaries "extend from Northern Boulevard on the south"; and that "[o]nly private legal action initiated by an individual organization representing the neighborhood can enforce a covenant."

206. BFHA's written statement described the Covenants' design as "establishing a minimum 20-foot setback requirement for all residential properties, and also prohibiting the construction of fences or walls" to maintain a "welcoming and 'open' and 'green' ambiance." It said nothing about apartment houses.

207. In the same statement BFHA offered to "provide the Department of Buildings with the address, including block and lot of each home covered by the Rickert-Finlay Covenant, within the borders of Broadway-Flushing."

208. BFHA therefore possesses, or can readily compile, a parcel-by-parcel list of the lots it contends are burdened and benefited.

209. Int. No. 280, which would have created a public registry of such covenants, was laid over by the Committee and filed at the end of session on December 31, 2017 without enactment.

210. No public registry of Rickert-Finlay lots exists, and the identity of the Covenant lots, and of BFHA's members among their owners, is peculiarly within BFHA's knowledge.

211. BFHA's Treasurer further testified that BFHA funds enforcement through "membership dues and voluntary contributions," that a single fence case "went on for about six years" and "cost our association $50,000," and that BFHA "work[s] very closely with all of our local civics and all of our elected officials."

212. BFHA is thus an organized, funded, and politically engaged enforcement body, not a passive association of neighbors.

213. BFHA has mounted, and has threatened to escalate, a campaign to stop the Project.

214. On August 10 through 13, 2026, BFHA circulated to its members a form statement of "Reasons for Opposing the Proposed 10-Story Building" over the signature of its President, which numerous residents submitted to the City Council verbatim.

215. BFHA's August 12, 2026 letter to the Council stated that BFHA "reserves all rights under law."

216. BFHA's consultant warned that, absent amendment of the application, "the applicant, applicant's agents, city agencies and elected officials involved in this proposed rezoning will have immediate legal action taken against them."

217. Upon information and belief, after the Council's approval BFHA began raising funds to sue Plaintiff, and on or about November 16, 2026 a draft verified complaint and motion for a temporary restraining order were transmitted to a person acting as an intermediary with Plaintiff.

**G. The Covenants' Exclusionary Effect on Multifamily and Affordable Housing**

218. Covenant Sixteenth prohibits, throughout the purportedly restricted tract outside

the small Covenant Twenty-Sixth area, any “two family house,” “flat,” or “apartment house.”

219. As BFHA seeks to apply it, Covenant Sixteenth operates today as a categorical, private prohibition on multifamily rental housing, and therefore on income-restricted affordable rental housing, within the tract.

220. The Project is the only multifamily, mixed-income residential development approved for the Northern Boulevard frontage of the 1906 Map area.

221. The Project will provide approximately 76 dwellings, including 19 permanently income-restricted units under Mandatory Inclusionary Housing, together with two- and three-bedroom units suitable for families.

222. Each of these units is a “dwelling” within the meaning of 42 U.S.C. § 3602(b).

223. The City Council has approved the zoning for the Project.

224. The Covenants are the sole remaining legal obstacle BFHA has identified.

225. If Defendants succeed in enforcing them, none of the Project’s dwellings, market-rate or affordable, will be built.

226. Upon information and belief, the owner-occupied single-family blocks of the 1906 Map tract differ materially in racial and ethnic composition, and in tenure and income, from the renter households and MIH-eligible households of Queens Community District 7 and Queens County.

227. Upon information and belief, renter households, and households income-eligible for Mandatory Inclusionary Housing units, in Queens County and in the New York City region are disproportionately Black and Hispanic when compared with owner-occupant households of single-family homes in the tract.

228. A prohibition on multifamily rental housing therefore falls disproportionately on Black and Hispanic households and predictably excludes them from the tract.

229. The City's own data confirm the exclusion.

230. The Racial Equity Report filed with the rezoning application (Urban Cartographics, Dec. 31, 2025), drawing on the 2020 Census for PUMA 4407 (roughly coextensive with Community District 7), reports that the area is 2.0 percent Black non-Hispanic and 18.1 percent Hispanic.

231. Racial Equity Report finds that "the Black population comprises only a fraction of the local population compared to its share at the borough or citywide level," and that the Hispanic share "is significantly lower than its share in all of Queens and NYC."

232. Between 2010 and 2020 the area's Black non-Hispanic population declined, from 5,522 to 5,431, even as the area's total population grew 9.1 percent.

233. Of approximately 45,481 owner-occupied units in the area, approximately 125 have a Black non-Hispanic householder.

234. White non-Hispanic households report a median income of $96,444, against $68,109 for Hispanic households and $61,543 for Black households (the latter figure flagged as statistically unreliable).

235. The neighborhood tabulation area containing the Property (QN0704, Murray Hill–Broadway–Flushing) is rated "High" on the City's Displacement Risk Map.

236. New York City's first Citywide Racial Equity Plan (Apr. 6, 2026) reports that "[a]pproximately 70% of New Yorkers in low-income, renter households are Black or Latino"; that 36 percent of Black- or Latino-headed households are severely rent burdened, compared with

28 percent of white-headed households; and that, in recent years, approximately 35 percent of New Yorkers receiving City-financed new-construction homes were Black and 32 percent Latino.

237. Citywide Racial Equity Plan further reports the Department of City Planning's finding that, from 2010 to 2020, "the neighborhoods with the highest housing growth rates also experienced the highest population gains among Black and Latino New Yorkers, while the neighborhoods with the lowest housing growth rates experienced Black population loss."

238. Community District 7 is such a low-growth district: its population grew 9.1 percent between 2010 and 2020, while its housing stock grew only 7.2 percent between 2010 and 2024.

239. A private ban on new multifamily and income-restricted rental housing in the tract therefore predictably excludes Black and Hispanic households and perpetuates their underrepresentation.

240. The public record of the rezoning reflects the demand the Covenants would suppress. Community District 7 has the highest rent-burdened population in Queens, at approximately 56.7 percent.

241. At the City Council's August 12, 2026 hearing, Flushing renters testified in support of the Project, including a renting parent who described a $3,000-per-month three-bedroom rent and friends still living in basements.

242. BFHA's consultant acknowledged that the City's Racial Equity Report for the application identifies elevated displacement risk in East Flushing, which includes Broadway-Flushing for statistical purposes.

243. Opponents framed their objection in terms of who the neighborhood is for. BFHA's Treasurer told the City Planning Commission that Broadway-Flushing "is not a neighborhood that

is screaming for affordable housing. It is not screaming for any housing," and that single-family zoning is "a lifestyle choice."

244. Upon information and belief, the exclusion of multifamily housing from the tract for more than a century has contributed to, and its continued enforcement would reinforce and perpetuate, the racial and ethnic composition of the tract described above, in contrast to the more diverse surrounding areas of Flushing.

245. Pursuant to Fed. R. Civ. P. 11(b)(3), Plaintiff specifically identifies the allegations in this Part G that are made upon information and belief as factual contentions that will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, including expert demographic analysis and discovery of BFHA's records concerning its enforcement of the Covenants.

246. Upon information and belief, BFHA has not enforced the Covenants against the commercial uses that line the Northern Boulevard frontage, including the Property's own thirty-year use as a professional building, but has invoked them against the first multifamily, mixed-income rental project proposed on that frontage.

247. Evidence of BFHA's enforcement history is peculiarly within BFHA's possession and control.

248. Defendants' threatened enforcement is current and continuing. It includes BFHA's May 11, 2026 letter asserting that the Covenants bar the Project, and Defendants' preparation of a verified complaint and motion for a temporary restraining order and preliminary injunction to enjoin construction, all within two years before the commencement of this action. 42 U.S.C. § 3613(a)(1)(A).

249. Less discriminatory means exist to serve any legitimate interest Defendants may

assert. The interior residential blocks are protected by contextual R1-2A zoning and by listing on the State and National Registers of Historic Places, and the Project's height and bulk are regulated by the R7A/C2-4 zoning approved after full public review.

250. BFHA has long sought additional municipal protection: its published history states that the Association's "next goal is City Landmark Preservation Status."

251. No New York City historic district has been designated.

252. A Landmarks Preservation Commission records search dated November 4, 2024 confirms that the Property "is not in a Historical Landmark District and is not currently designated an Individual Landmark," and the Commission determined on July 22, 2025 that the Property has no architectural or archaeological significance.

253. To the extent BFHA seeks through private enforcement what the City has not conferred through public designation, that interest can be served by the public processes available to it, with less discriminatory effect.

**H. The Covenants' Cost Thresholds and Their Exclusionary Origins**

254. The Covenants do not merely regulate building form. They fix the price of entry. Covenants First through Fifth prohibit any "house" in specified areas "costing less than" $3,000, $4,000, or $5,000.

255. Covenant Twenty-Sixth prohibits, even within the only area where apartment houses are permitted, any single apartment house costing "less than $4000" and any double apartment house costing "less than $6000."

256. Together with Covenant Sixteenth's ban on every "two family house," "flat," and "apartment house" outside the Covenant Twenty-Sixth area, these provisions excluded from most of the tract every form of housing within reach of households of modest means.

257. At those incomes, a house costing at least $3,000 to $5,000 to build, exclusive of land, was beyond the reach of most Black and other minority households, which were thereby predictably excluded from the tract at the time the Covenants were adopted.

258. The cost thresholds were tiered by geography.

259. The 1920 Deed fixes the highest minimum, $5,000, for houses "between Broadway and State Street, west of the centre line of Block 21," sets $4,000 minimums for other sections, and permits $3,000 houses only "north of State street, east of the centre line of Block 22."

260. Covenant Tenth further bars any house "on a plot fronting on Broadway containing less than 5 lots." Broadway is now Northern Boulevard, and State Street is now 35th Avenue.

261. BFHA's own expert has described the plan those tiers implemented. In BFHA's 2013 enforcement action, Paul Graziano testified that "the intention of the Rickert–Finlay Realty Company at the time of creation, was to create a zone near the Long Island Railroad Station that would allow for commercial activity, as well as mixed working, middle, and upper class enclaves surrounded by more upper class housing." *E. N.Y. Enters.*, 2013 N.Y. Slip Op. 51243(U), at *2.

262. Mr. Graziano further testified that "outside the Section 26 area there were no two-family houses or apartment buildings" among the properties subject to the Covenant. *Id.* at *3.

263. By BFHA's own evidence, therefore, the Covenants were designed to stratify the tract by wealth and class, and for more than a century they have succeeded in excluding every two-family and multifamily dwelling from the restricted area outside a single enclave.

264. Contemporaneous evidence of Black earnings in New York City confirms the exclusionary reach of the cost thresholds.

265. A 1912 Columbia University study of Black wage-earners in New York City, based on employment-agency records for 1906 to 1909, found that 75.2 percent of 682 Black men in

domestic and personal service earned less than $6.00 per week, and that 92.2 percent of 2,138 Black women earned less than $6.00 per week.

266. At $6.00 per week, or $312 per year, the Covenants' $3,000 minimum equaled more than nine years' gross wages, and the $5,000 minimum more than sixteen years' gross wages, before the cost of land.

267. Upon information and belief, Rickert-Brown Realty Corporation imposed the cost thresholds and the multifamily prohibition, at least in part, for the purpose of restricting the racial and ethnic composition of the tract.

268. That purpose may be inferred from the following circumstances, among others: (a) the Covenants were imposed lot by lot between March 1920 and October 1922, an era in which, upon information and belief, minimum-cost and single-family deed restrictions were used in suburban subdivisions in the New York region as instruments of racial exclusion; (b) the cost thresholds were set at levels that, upon information and belief, bore no relation to building safety or quality and functioned only to screen purchasers by wealth; (c) the multifamily prohibition foreclosed the rental housing in which, upon information and belief, Black households in Queens then disproportionately lived; and (d) [insert any racially restrictive covenant, advertising, sales brochure, or other historical evidence located in the tract deeds or in Rickert-Finlay or Rickert-Brown marketing materials].

269. BFHA has carried those exclusionary origins forward.

270. BFHA's published history states that its founders "had watched, with alarm, single family homes in neighboring areas with higher density zoning gobbled up by builders and developers who were replacing them with one apartment house after another," and that the

Association was formed as "the bulwark" against apartment development as the 1964 World's Fair approached.

271. In 2026, BFHA's Treasurer told the City Planning Commission that Broadway-Flushing "is not a neighborhood that is screaming for affordable housing," and BFHA invoked the Covenants for the first time against the first multifamily, mixed-income rental building approved on the Northern Boulevard frontage, after decades of tolerating commercial uses there.

272. The Chair of the City Planning Commission observed on the record that "some covenants have ultimately not been enforceable, including because some were exclusionary in nature."

273. Pursuant to Fed. R. Civ. P. 11(b)(3), Plaintiff specifically identifies the allegations in this Part H that are made upon information and belief as factual contentions that will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, including historical and economic expert analysis, review of the complete set of tract deeds recorded between 1920 and 1922, and discovery of BFHA's records concerning its formation, purposes, and enforcement of the Covenants.

274. Evidence of the grantor's purposes in 1920 and of BFHA's internal enforcement decisions is not reasonably available to Plaintiff without discovery.

**<u>AS AND FOR A FIRST CAUSE OF ACTION</u>**

(Fair Housing Act, 42 U.S.C. §§ 3604(a), 3613 — Disparate Impact and Discriminatory Intent — Against BFHA and the Ciccolillis)

275. Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth herein.

276. It is unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. §

3604(a).

277. Prohibited conduct includes conduct that "otherwise makes unavailable or denies dwellings to persons" because of a protected characteristic. 24 C.F.R. § 100.70(b).

278. Liability may be established "based on a practice's discriminatory effect . . . even if the practice was not motivated by a discriminatory intent." 24 C.F.R. § 100.500.

279. A practice has a discriminatory effect where it "actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin." Id. § 100.500(a).

280. Defendants' enforcement and threatened enforcement of Covenant Sixteenth, and of Covenant Sixth as applied to the Project's mixed use, against the Project is a practice that would make unavailable or deny dwellings within the meaning of § 3604(a).

281. Under the burden-shifting framework of 24 C.F.R. § 100.500(c), Plaintiff bears the initial burden of showing that the challenged practice caused or predictably will cause a discriminatory effect; the burden then shifts to Defendants to prove that the practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests; and Plaintiff may still prevail by showing that those interests could be served by another practice that has a less discriminatory effect. 24 C.F.R. § 100.500(c)(1)-(3).

282. For the reasons alleged in Part G, that practice actually or predictably results in a disparate impact on Black and Hispanic households, which are protected on the basis of race, color, and national origin under 42 U.S.C. § 3604(a). Black and Hispanic households make up a disproportionate share of the renter households and Mandatory Inclusionary Housing–eligible households that the Project would serve, yet they are sharply underrepresented in Community

District 7, which is 2.0 percent Black non-Hispanic and 18.1 percent Hispanic, and in the owner-occupied housing of the area, where approximately 125 of approximately 45,481 owner-occupied units have a Black non-Hispanic householder. The practice therefore falls more harshly on Black and Hispanic households than on others, and it reinforces and perpetuates segregated housing patterns in the tract. Defendants' enforcement of the Covenants is the direct cause of that effect: absent enforcement, the Project's dwellings, including its affordable units, will be built and made available to Black and Hispanic households, among others.

283. The practice is not necessary to achieve any substantial, legitimate, nondiscriminatory interest of Defendants.

284. To the extent any such interest exists, it can be served by practices with a less discriminatory effect, including the existing contextual zoning, historic-register protections, and the R7A/C2-4 zoning controls applicable to the Project. 24 C.F.R. § 100.500(c)(3).

285. Independently, for the reasons alleged in Part H, the Covenants' minimum-cost thresholds, together with Covenant Sixteenth's ban on multifamily housing, actually or predictably exclude Black and Hispanic households, which are protected on the basis of race, color, and national origin, from the tract and perpetuate the segregated housing pattern they were designed to produce.

286. Each time Defendants invoke those provisions, they reinforce and perpetuate that pattern. 24 C.F.R. § 100.500(a).

287. To state a prima facie disparate-impact claim, Plaintiff must allege "(1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 617 (2d Cir. 2016) (internal

quotation marks omitted). Plaintiff must also allege facts "demonstrating a causal connection" between the challenged practice and the disparity. *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 543 (2015).

288. A discriminatory effect includes both a disparate impact on a protected group and the creation, reinforcement, or perpetuation of segregated housing patterns. 24 C.F.R. § 100.500(a).

289. Plaintiff must also allege facts "demonstrating a causal connection" between the challenged practice and the disparity. *Inclusive Cmtys.*, 576 U.S. at 543.

290. A discriminatory effect includes both a disparate impact on a protected group and the creation, reinforcement, or perpetuation of segregated housing patterns. 24 C.F.R. § 100.500(a).

291. Plaintiff alleges both forms of discriminatory effect, together with the direct causal link between Defendants' enforcement of the Covenants and those effects, as alleged in Parts G and H and above.

292. Defendants' enforcement of the Covenants against the Project also constitutes intentional discrimination.

293. Under the FHA, a plaintiff alleging disparate treatment need show only that a protected characteristic was "one motivating factor" in the defendant's conduct. *See Gilead Cmty. Servs., Inc. v. Town of Cromwell*, 112 F.4th 93, 99 (2d Cir. 2024) (applying the motivating-factor standard to a disability discrimination claim under 42 U.S.C. § 3604(f)).

294. A prima facie case may be established "by showing that animus against the protected group was a significant factor in the position taken by the municipal decision-makers

themselves or by those to whom the decision-makers were knowingly responsive." *Mhany*, 819 F.3d at 606 (internal quotation marks omitted).

295. The same principles govern the enforcement decisions of BFHA and the Ciccolillis.

296. Because discriminatory intent is rarely susceptible to direct proof, it may be established through circumstantial as well as direct evidence, including the impact of the challenged action, its historical background, the specific sequence of events leading up to it, and departures from normal procedure or substantive criteria. *Mhany*, 819 F.3d at 606; *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–68 (1977).

297. Each of those factors supports an inference of discriminatory purpose here, as alleged in the following seven paragraphs.

298. As to impact, enforcement would bar all of the Project's dwellings, including its income-restricted units.

299. Enforcement would also fall most heavily on Black and Hispanic households, as alleged in Parts G and H.

300. As to historical background, the Covenants' cost thresholds and multifamily ban originated, upon information and belief, as instruments of racial and economic exclusion.

301. BFHA itself was formed as a "bulwark" against apartment houses.

302. As to the sequence of events, BFHA tolerated decades of commercial violations on the Northern Boulevard frontage.

303. BFHA then invoked the Covenants against the first mixed-income rental building proposed there, after its officers told the City that the neighborhood is "not . . . screaming for affordable housing."

304. As to departures from BFHA's own practice, BFHA seeks to enforce the Covenants against a parcel outside the territory shown on its own boundary map.

305. Upon information and belief, a motivating factor in Defendants' enforcement is the race, color, and national origin of the prospective tenants of the Project's rental and affordable units, who are disproportionately Black and Hispanic.

306. Upon information and belief, Defendants know that the Project's rental and income-restricted units will be marketed to the renter and MIH-eligible population of Queens and the New York City region, in which Black and Hispanic households are overrepresented.

307. Upon information and belief, Defendants invoked the Covenants against those units, and not against the decades of commercial violations on the same frontage, for that reason.

308. Upon information and belief, Defendants acted in response to, and were knowingly responsive to, community opposition to the Project premised on who would occupy its rental and affordable housing.

309. Intent may also be inferred from the sequence of events leading up to the challenged action, including action taken against a particular site after the actor learns of plans to build integrated housing there. *See Arlington Heights*, 429 U.S. at 267.

310. The historical background here includes BFHA's own record on this frontage.

311. In 2005, the City proposed R6B zoning to permit multifamily buildings along Northern Boulevard.

312. BFHA supported the East Flushing rezoning "with the exception of the proposed R6B along Northern Boulevard and Sanford Avenue."

313. BFHA objected that the proposed R6B district "would allow too many potential developments."

314. The Commission reduced the district to R5B.

315. Upon information and belief, BFHA has consistently opposed multifamily rental housing on the Northern Boulevard frontage.

316. Upon information and belief, BFHA has at the same time acquiesced in commercial uses there.

317. Defendants' conduct is also actionable because a private actor's enforcement decisions may not be made in response to discriminatory opposition.

318. A private actor's enforcement decision violates the FHA where animus against a protected group was a significant factor in the position taken by the decision-makers or by those to whom they were knowingly responsive. *See* *Mhany*, 819 F.3d at 606.

319. Upon information and belief, BFHA's decision to sue was made in response to the organized community opposition to the Project described in Part F.

320. Plaintiff has standing.

321. The FHA confers a right of action on any "aggrieved person," defined to include any person who "claims to have been injured by a discriminatory housing practice" or "believes that such person will be injured by a discriminatory housing practice that is about to occur." 42 U.S.C. § 3602(i).

322. A "person" includes corporations and associations. 42 U.S.C. § 3602(d).

323. The definition of "aggrieved person" "extends as broadly as permitted by Article III of the Constitution." *Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 44 (2d Cir. 2015) (quotation omitted).

324. Membership in a protected class therefore is not required. *See* *Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 197–98 (2017).

325. Plaintiff is an "aggrieved person" entitled to sue under 42 U.S.C. § 3613(a).

326. As the owner and developer of the Project, Plaintiff has suffered and will suffer concrete injury, including approximately $1,000,000 in predevelopment expenditures on a specific, approved project, delay, carrying costs, impaired financing, and the threatened prohibition of the Project.

327. There is a substantial probability that, absent Defendants' conduct, the Project's housing, including housing with greater minority occupancy, will be built. *See Mhany*, 819 F.3d at 600–01; *Arlington Heights*, 429 U.S. at 261–62 (developer whose "detailed and specific" project faced an "absolute barrier" had standing); *Anderson Grp.*, 805 F.3d at 45–46.

328. This action is timely under 42 U.S.C. § 3613(a)(1)(A), because Defendants' discriminatory housing practice is ongoing and occurred within two years before this action was commenced.

329. Plaintiff is entitled to a declaration that Defendants' enforcement of the Covenants against the Property and the Project would violate, on both a disparate-impact and an intentional-discrimination theory, 42 U.S.C. § 3604(a).

330. Plaintiff is entitled to a temporary, preliminary, and permanent injunction restraining such enforcement under 42 U.S.C. § 3613(c)(1).

331. Plaintiff is entitled to its reasonable attorneys' fees and costs under 42 U.S.C. § 3613(c)(2).

## AS AND FOR A SECOND CAUSE OF ACTION

(Extinguishment Under RPAPL 1951 — Against All Defendants)

332. Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth herein.

333. RPAPL 1951(2) provides that, when relief against such a restriction is sought in an action to quiet title or to obtain a declaration with respect to its enforceability, "if the court shall find that the restriction is of no actual and substantial benefit to the persons seeking its enforcement or seeking a declaration or determination of its enforceability, either because the purpose of the restriction has already been accomplished or, by reason of changed conditions or other cause, its purpose is not capable of accomplishment, or for any other reason, it may adjudge that the restriction is not enforceable by injunction . . . and that it shall be completely extinguished upon payment, to the person or persons who would otherwise be entitled to enforce it in the event of a breach at the time of the action, of such damages, if any, as such person or persons will sustain from the extinguishment of the restriction."

334. RPAPL 1951 reflects New York's settled policy that "the law has long favored free and unencumbered use of real property, and covenants restricting use are strictly construed against those seeking to enforce them." *Witter v. Taggart*, 78 N.Y.2d 234, 237 (1991).

335. Under RPAPL 1951, "[t]he issue is not whether [the enforcing party] obtains any benefit from the existence of the restriction but whether in a balancing of equities it can be said to be, in the wording of the statute, 'of no actual and substantial benefit.'" *Orange & Rockland Utils., Inc. v. Philwold Ests., Inc.*, 52 N.Y.2d 253, 266 (1981) (emphasis omitted).

336. A restriction therefore need not be wholly valueless to be extinguished. *Bd. of Educ., E. Irondequoit Cent. Sch. Dist. v. Doe*, 88 A.D.2d 108, 114–15 (4th Dep't 1982).

337. As applied to the Property, the Covenants confer no actual and substantial benefit on any Defendant, for at least the specific reasons alleged in the following nine paragraphs.

a. The Property is commercial frontage on a 100-foot-wide arterial.

b. The Property has been used for decades for business and professional purposes in violation of Covenant Sixth.

c. The City classifies and assesses the Property as a commercial professional building.

d. The residential character the Covenants sought to protect therefore does not exist on the Property and cannot be restored there.

e. BFHA itself sought and obtained zoning that conformed the Northern Boulevard frontage to its "actual development: 100 feet commercial."

f. The height, bulk, and density of the Project are governed by the R7A/C2-4 zoning approved by the City Council after full public review.

g. The interior residential blocks of Broadway-Flushing are independently protected by contextual R1-2A zoning and historic-register designation.

h. Any purpose of preserving the residential character of those blocks has therefore been accomplished by other means.

i. The Covenants' cost, stable, outbuilding, flat-roof, and per-floor provisions are incapable of accomplishment under present conditions.

338. Each changed condition alleged in Part C post-dates the 1920 Deed.

339. As applied to the Property, the Covenants are valueless to Defendants.

340. BFHA concedes that commercial stores on Northern Boulevard are "fine."

341. The Ciccolillis' predecessors in title consented in 1960 to restaurant, bar, cabaret, catering, and parking uses on the Property.

342. The Property was used as a medical office building for three decades without objection.

343. The residential side streets are protected by contextual zoning, the Commission's reduction of the commercial overlay depth to 100 feet, and historic-register designation.

344. As applied to commercial frontage on the south side of a six-lane arterial, outside the territory BFHA itself claims, the Covenants are of no actual and substantial benefit to Defendants.

345. The Covenants would be extinguished as to the Property even under a "valueless" standard. *See* *Bd. of Educ.*, 88 A.D.2d at 118 (extinguishing residential restriction as to lots on a road where "the surrounding area has become so commercial in character that the restrictive covenant serves little purpose").

346. "The first and foremost factor to be considered [in determining whether to extinguish a restriction] is whether the property is capable of being put to the use required by the restriction[ ]." *Zimmerman v. Seven Corners Dev., Inc.*, 237 A.D.2d 892, 893 (4th Dep't 1997) (quoting *Bd. of Educ.*, 88 A.D.2d at 115).

347. The Property cannot practically be put to the single-family residential use the Covenants would require.

348. Plaintiff's investment in the Property is approximately $7.4 million.

349. Upon information and belief, a single-family house on this commercial corner of a six-lane arterial, even if one could be financed and built, would have a market value of approximately $1,000,000.

350. No rational owner would build one.

351. No purchaser offered to do so.

352. Although the Property is theoretically capable of residential use, it cannot practically or reasonably be converted to single-family use without ruinous loss.

353. Plaintiff pleads specific reasons, not conclusions.

354. A complaint under RPAPL 1951 must allege that, upon a balancing of the equities, the restriction is of no actual and substantial benefit to the party seeking to enforce it, and must allege the reasons why. *Neri's Land Improvement, LLC v. J.J. Cassone Bakery, Inc.*, 65 A.D.3d 1312, 1314 (2d Dep't 2009); *U & Me Homes, LLC v. Cnty. of Suffolk*, 249 A.D.3d 1215, 1219–20 (2d Dep't 2026).

355. Each reason is alleged above.

356. Nor is Plaintiff's hardship self-created in any sense that should weigh against relief.

357. Plaintiff does not seek to escape the consequences of building in defiance of a known enforcement claim.

358. Plaintiff instead acquired a parcel whose commercial character and use had been established, consented to by the adjoining owners, and left unchallenged for decades before Plaintiff took title.

359. The Property was commercially developed decades before Plaintiff acquired it.

360. The Property's neighbors consented of record to its commercial use decades before Plaintiff acquired it.

361. Plaintiff paid $6,378,000, full commercial value, for an operating commercial building whose seller had used it for business purposes for thirty years without objection.

362. Extinguishment is particularly warranted where enforcement would operate as a total ban on the use for which the land is now zoned and suited.

363. As BFHA would apply them, the Covenants bar every residential use of the Property other than a single-family house costing "not less than" the 1920 minimum on commercial frontage of a six-lane arterial.

364. As BFHA would apply them, the Covenants also bar every business use outside Blocks 20 and 26.

365. Together, those restrictions foreclose any economically viable use of a 14,141-square-foot commercial corner lot rezoned R7A/C2-4.

366. The balance of the equities favors extinguishment.

367. Enforcement would prohibit an approved, mixed-income housing development on a commercial arterial.

368. Any benefit to Defendants is, at most, a preference regarding building scale on commercial frontage that has long been used in violation of the Covenants.

369. Plaintiff is entitled to a judgment adjudging that the Covenants are not enforceable by injunction against the Property and are completely extinguished as to the Property, upon payment of such damages, if any, as the Court may determine.

370. To the extent the Court determines that Defendants' enforcement of the Covenants against the Project would violate the Fair Housing Act, no damages should be payable to Defendants under RPAPL 1951(2) for the loss of that enforcement right. *Cf.* *S & R Dev. Ests., LLC v. Town of Greenburgh*, 336 F. Supp. 3d 300, 314–15 (S.D.N.Y. 2018) (holding that a covenant holder's RPAPL 1951(2) claim for compensation would be preempted by the FHA if its enforcement of the covenant were found to violate the Act).

## AS AND FOR A THIRD CAUSE OF ACTION

(Declaratory Judgment, 28 U.S.C. § 2201; *cf.* CPLR 3001 — Covenants Unproven, Inapplicable, and Unenforceable as to the Property — Against All Defendants)

371. Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth herein.

372. Restrictive covenants are strictly construed against those seeking to enforce them.

*Witter*, 78 N.Y.2d at 237–38.

373. The party seeking enforcement must establish the existence of the restraint by clear and convincing proof. *Fader v. Taconic Tract Dev., LLC*, 128 A.D.3d 887, 888–89 (2d Dep't 2015).

374. The enforcing party must likewise prove the scope of the restriction by clear and convincing evidence. *Kleist v. Stern*, 174 A.D.3d 1451, 1453 (4th Dep't 2019).

375. Where the language of a restrictive covenant is equally susceptible of two interpretations, the less restrictive interpretation controls.

376. The covenant must be interpreted to limit, rather than extend, its restriction. *See* *Crane Neck Ass'n, Inc. v. NYC/Long Island Cnty. Servs. Grp.*, 92 A.D.2d 119, 126 (2d Dep't 1983).

377. All doubts and ambiguities are resolved in favor of the free use and enjoyment of property and against restrictions. *See* *Van Schaick v. Trs. of Union Coll.*, 285 A.D.2d 859, 862 (3d Dep't 2001).

378. A covenant that does not unequivocally prohibit a use therefore does not reach it.

379. Nothing in Covenant Sixteenth unequivocally reaches a mixed-use building with ground-floor retail on a commercial arterial.

380. A party who is a stranger to the deed and claims the benefit of a covenant under a common plan or scheme must establish that plan by clear and definite evidence. *Steinmann v. Silverman*, 14 N.Y.2d 243, 245–46 (1964).

381. Relevant considerations include the substance of the restrictions, the language employed, the manner and form of any representations made to purchasers, and the compatibility of the restrictions with surrounding property.

382. A filed map that itself imposes no restriction cannot supply the uniform scheme of restrictions the doctrine requires.

383. The open commercial development of the immediate vicinity is inconsistent with any plan to keep this frontage residential.

384. BFHA contends that a common scheme arises where an owner of a large tract divides it into building lots for sale to different purchasers by deeds containing uniform covenants.

385. That principle does not reach this record.

386. The owner that filed the 1906 Map, Rickert-Finlay Realty Co., did not impose the Covenants.

387. A different corporation, Rickert-Brown Realty Corporation, imposed them lot by lot fourteen to sixteen years later.

388. Covenant Twenty-Seventh itself excludes plots “not owned or controlled” by the grantor.

389. BFHA’s own consultant has testified that only approximately 541 of approximately 1,305 households within BFHA’s boundaries lie in the Covenant area.

390. Restrictions that the grantor itself declared inapplicable to parts of the tract are not “uniform covenants.”

391. Defendants cannot carry their burden as to the Property, for the reasons alleged in the following eight paragraphs.

392. The 1906 Map imposed no restriction.

393. The 1920 Deed was given by Rickert-Brown Realty Corporation, not by the entity that filed the 1906 Map.

394. Covenant Twenty-Seventh concedes that plots within the tract were not subject to the Covenants.

395. Covenant Twenty-Eighth binds only the grantee and its successors.

396. Covenant Twenty-Eighth identifies no dominant estate or intended beneficiary.

397. The deeds into the Property's last two owners, including the 1995 deed recorded at Reel 4225, Page 1974, do not recite or refer to the Covenants.

398. Defendants have identified no instrument restating the Covenants in the chain of title of Tax Lot 14.

399. The Property's surroundings on Northern Boulevard are commercial and incompatible with any residential plan.

400. Independently, Covenant Sixteenth does not, on its strict terms, reach the Project.

401. Covenant Sixteenth bars a building "of the character known as" a "two family house," "flat," or "apartment house," as those terms were understood in 1920.

402. The Project is a mixed-use building with ground-floor local retail on a commercial arterial.

403. Construed to limit rather than extend its restriction, Covenant Sixteenth does not prohibit the Project.

404. Plaintiff is entitled to a declaration that the Covenants are inapplicable to, and unenforceable against, the Property and the Project.

## AS AND FOR A FOURTH CAUSE OF ACTION

(Declaratory Judgment — Equitable Non-Enforcement for Changed Conditions — Against All Defendants)

405. Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth herein.

406. Equity will refuse to enforce a restrictive covenant on account of changed conditions where enforcement would greatly harm the burdened owner without any substantial benefit to the party seeking enforcement, so as to make enforcement inequitable. *See* *Orange & Rockland*, 52 N.Y.2d at 266; *Bd. of Educ.*, 88 A.D.2d at 117–18.

407. Equity intervenes to prevent irreparable injury to comfort and enjoyment, not to protect a mere preference.

408. For the reasons alleged above, the character of the Northern Boulevard frontage, including the Property, has changed so fundamentally that the Covenants' purposes cannot be accomplished there.

409. Enforcement would inflict grave harm on Plaintiff and on the public interest in new housing.

410. Enforcement would confer no substantial benefit on Defendants.

411. Plaintiff is entitled to a declaration that the Covenants may not be enforced in equity against the Property.

**AS AND FOR A FIFTH CAUSE OF ACTION**
(Declaratory Judgment — Abandonment and Waiver — Against All Defendants)

412. Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth herein.

413. A restrictive covenant is abandoned or waived, and equity will not enforce it, where those claiming its benefit have acquiesced in violations so substantial and pervasive, in the area at issue, that the object of the restriction has been defeated. *See* *Shmeria, LLC v. Sea Gate Ass'n*, 249 A.D.3d 776, 780 (2d Dep't 2026) (extinguishing restriction where the association "had permitted the access restriction to be violated and declined to enforce it for several years and had effectively waived the access restriction").

414. Plaintiff does not rely on isolated or inoffensive violations.

415. Plaintiff relies on the open, continuous, and acquiesced-in conversion of the Northern Boulevard frontage, including the Property itself, to the precise use the Covenants forbid.

416. The Covenants have been openly, continuously, and substantially violated without enforcement, as alleged in the following nine paragraphs.

417. The Property has been used for decades for business, medical, and professional purposes in violation of Covenant Sixth.

418. Northern Boulevard Associates, LLC operated the existing building for those purposes from 1995 to 2025.

419. Upon information and belief, Northern Boulevard Associates, LLC also expanded the existing building during that period.

420. A commercial billboard, surface parking lot, and commercial building fronting Northern Boulevard have been maintained on the Property.

421. A two-story commercial building stands on Tax Lot 25, immediately adjoining the Property on Northern Boulevard, outside the “business section” of Covenant Sixth.

422. The first 100 feet of frontage along five blocks of Northern Boulevard has been developed commercially.

423. BFHA itself acknowledged that commercial development as the “actual development” of the frontage.

424. BFHA caused that frontage to be zoned commercial rather than seeking abatement of its commercial development.

425. BFHA attributes the Covenant violation underlying its 1988 litigation to the Northern Boulevard “mis-zoning.”

426. BFHA has admitted that the Northern Boulevard frontage is commercial in "actual development."

427. BFHA asked the City to zone that frontage accordingly.

428. BFHA's Treasurer testified in 2026 that commercial stores along Northern Boulevard are "fine."

429. These admissions and acts constitute acknowledgment of and acquiescence in the commercial development of that frontage in violation of Covenant Sixth.

430. The acquiescence is further confirmed by the facts alleged in the following five paragraphs.

431. In the 1960 Agreement, the adjoining owners consented in writing to restaurant, bar, cabaret, catering, and parking uses on the Property.

432. Galaxy Plaza was constructed between 1987 and 1990, without challenge, under a City certificate of occupancy and commercial tax incentive.

433. The seller represented in the Contract that it had received no notice of any claim concerning the Property.

434. Upon information and belief, a century-old six-story apartment building stands at the corner of 161st Street and Northern Boulevard.

435. Upon information and belief, pre-war apartment buildings also stand on Station Road.

436. Under RPAPL 2001, an action to enforce a restriction by compelling the removal or alteration of a structure, or to recover damages, where the restriction relates to, among other things, the location, independent character, height, or "general purpose for which [structures] shall

be designed or typically suited," must be commenced within two years after completion of the structure (or by September 1, 1965, whichever is later).

437. If such an action is not so commenced, "it shall be conclusively presumed that the right of action . . . has been released." RPAPL 2001(1), (2), (5).

438. Any such right of action against the existing structures on the Property and on Tax Lot 25 has long since been released.

439. BFHA's own draft papers confirm the acquiescence.

440. They describe the Covenants' purpose as preserving "an open, park-like streetscape."

441. They contend that the subdivision remains "primarily single-family" only "with respect to residential uses."

442. BFHA thereby concedes that the commercial uses lining Northern Boulevard have been allowed to stand.

443. BFHA's published history likewise acknowledges that "courts may be less amenable in areas where violations of old covenants have already been allowed to occur."

444. BFHA's selective-enforcement testimony in 2013 is itself an admission of acquiescence.

445. BFHA chose not to pursue violations that did not, in its view, affect "esthetics."

446. Upon information and belief, BFHA never pursued the Property's restaurant, catering, medical, radiology, billboard, and parking uses, all on the Northern Boulevard frontage.

447. Upon information and belief, BFHA never pursued Galaxy Plaza, which also lies on the Northern Boulevard frontage.

448. Those uses are not de minimis deviations.

449. They are the wholesale conversion of the frontage to the very use Covenant Sixth forbids.

450. They are therefore unlike the isolated residential deviations that the Supreme Court, Queens County, found insufficient to forfeit enforcement in BFHA's 2013 action. *Cf.* *E. N.Y. Enters.*, 2013 N.Y. Slip Op. 51243(U), at *7.

451. BFHA's own 2015 testimony shows that it understood the Covenants to cover only "approximately one-half" of the homes within its boundaries.

452. That testimony also shows that BFHA understood the Covenants to concern setbacks and fences.

453. Its decades-long silence about commercial uses on the Northern Boulevard frontage, coupled with its successful petitioning to have that frontage zoned commercial in 2005 and 2009, evidences an intention to abandon any use restriction on that frontage.

454. Defendants have therefore abandoned and waived the Covenants as to the Northern Boulevard frontage, including the Property.

455. Defendants are estopped from selectively enforcing the Covenants against Plaintiff.

## AS AND FOR A SIXTH CAUSE OF ACTION

(Quiet Title, RPAPL Article 15 — Against All Defendants)

456. Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth herein.

457. This cause of action is brought pursuant to RPAPL article 15, including RPAPL 1515.

458. Plaintiff holds an estate in fee simple absolute in the Property, which immediately accrued to Plaintiff by deed from Northern Boulevard Associates, LLC dated May 20, 2025 (CRFN 2025000142473).

459. The Property is known as 158-06 Northern Boulevard, Flushing, New York 11358, and is designated on the Tax Map of the City of New York for the Borough of Queens as Block 5277, Lot 16, as more particularly described by metes and bounds in that deed.

460. BFHA and the Ciccolillis are known defendants.

461. The Non-Member Doe Defendants are unknown defendants whose identities will be ascertained as alleged above.

462. Upon information and belief, no known defendant is or might be an infant, has a developmental disability or mental illness, or abuses alcohol.

463. Plaintiff is presently without knowledge whether any unknown defendant is or might be such a person.

464. Upon information and belief, the judgment will not affect any person not in being or ascertained at the commencement of this action who, by any contingency contained in a devise or grant or otherwise, could afterward become entitled to a beneficial estate or interest in the Property.

465. No personal claim is made against any defendant other than a defendant who asserts a claim adverse to the claim of Plaintiff set forth in this Complaint.

466. Plaintiff holds fee simple title to the Property.

467. Defendants claim an interest adverse to Plaintiff's title, namely the right to enforce the Covenants against the Property.

468. For the reasons alleged above, that claimed interest is invalid, unenforceable, abandoned, or subject to extinguishment.

469. That claimed interest constitutes a cloud on Plaintiff's title.

470. Plaintiff is entitled to a judgment under RPAPL article 15 and RPAPL 1951(2) barring Defendants, and all persons claiming under them, from asserting any right under the Covenants against the Property.

471. Plaintiff is further entitled to an order directing that the judgment be recorded against the Property.

**AS AND FOR A SEVENTH CAUSE OF ACTION**
(Declaratory Judgment — Covenants Unreasonable and Contrary to Public Policy as Applied — Against All Defendants)

472. Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth herein.

473. "Restrictive covenants will be enforced when the intention of the parties is clear and the limitation is reasonable and not offensive to public policy." *Chambers v. Old Stone Hill Rd. Assocs.*, 1 N.Y.3d 424, 431 (2004).

474. A covenant whose limitation is unreasonable, or offensive to public policy, as applied, does not meet that standard.

475. A restriction may be void as repugnant to the estate granted, contrary to public policy, or unreasonable.

476. As applied to commercial arterial frontage that the City has rezoned for mixed-income housing, the Covenants, which are perpetual, have no release mechanism, and are keyed to obsolete 1920 cost and building standards, are unreasonable.

477. As so applied, the Covenants offend the public policy of the State and City favoring the production of housing, including affordable housing.

478. New York courts will refuse equitable enforcement of a private covenant where enforcement would frustrate a clearly expressed public policy.

479. Here, the Covenants obstruct the City's Mandatory Inclusionary Housing program, adopted for this very site by Resolution No. 674.

480. The Covenants also obstruct the national policy of the Fair Housing Act.

481. Plaintiff does not contend that the rezoning, standing alone, abrogates the Covenants.

482. Plaintiff alleges that the City Council's legislative determination, together with the facts alleged above, establishes that enforcement of the Covenants against the Property would be unreasonable and contrary to public policy.

483. Plaintiff is entitled to a declaration that the Covenants are void and unenforceable as applied to the Property.

## AS AND FOR AN EIGHTH CAUSE OF ACTION

(Declaratory Judgment — Release, Waiver, and Estoppel Under the 1960 Agreement — Against the Ciccolillis, BFHA in Its Representative Capacity, and the Non-Member Doe Defendants Who Own the 1960 Agreement Parcels)

484. Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth herein.

485. By the 1960 Agreement and the recorded withdrawal of objections, the record owners of 40-11, 40-16, and 40-20 159th Street and 40-19 and 40-25 158th Street consented in writing to the commercial rezoning of the Property.

486. Those owners also consented in writing to the Property's use as "a dwelling, restaurant, bar, cabaret and catering, with parking establishment."

487. They agreed that the instrument would bind "the successors and assigns of the parties hereto."

488. Upon information and belief, the Ciccolillis and the current owners of the other 1960 Agreement parcels hold title as successors and assigns of the 1960 signatories, with record notice of the 1960 Agreement.

489. In reliance on that consent, the Property was rezoned and used commercially for more than six decades.

490. Successive owners, including Plaintiff, purchased the Property as commercial property.

491. Plaintiff paid $6,378,000 for the Property.

492. Having consented of record to commercial use of the Property, the Ciccolillis and the other 1960 Agreement successors have released and waived, and are equitably estopped from asserting, any right to enforce Covenant Sixth or any other Covenant restricting the use of the Property to residential purposes.

493. Plaintiff is entitled to a declaration that the Ciccolillis and the other 1960 Agreement successors may not enforce the Covenants' business-use restrictions against the Property.

494. Plaintiff is further entitled to a declaration that their claimed right to enforce the remaining Covenants is subject to the same waiver and estoppel to the extent those Covenants would bar the mixed use the 1960 Agreement contemplated.

## AS AND FOR A NINTH CAUSE OF ACTION

(Declaratory Judgment — BFHA Has No Right in Its Own Name to Enforce the Covenants Against the Property, and Is Bound in Its Representative Capacity — Against BFHA)

495. Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth herein.

496. The benefit of a restrictive covenant may be enforced only by a party who holds that benefit, either as the original covenantee or its successor, or as the owner of land within a

common scheme that the covenant was intended to benefit. *See* *Malley v. Hanna*, 65 N.Y.2d 289, 291–92 (1985); *Steinmann*, 14 N.Y.2d at 245–46.

497. The party seeking enforcement must prove, by clear and convincing evidence, the existence and scope of the restriction and its own right to enforce it.

498. BFHA is not Rickert-Brown Realty Corporation or its successor.

499. It was not a party to the 1920 Deed.

500. It holds no interest in any instrument in the Property's chain of title.

501. Upon information and belief, BFHA owns no land within the 1906 Map tract.

502. BFHA's membership is not limited to owners of land benefited by the Covenants.

503. Its governing documents do not authorize it to sue on behalf of non-members.

504. The Property lies outside the area in which BFHA ordinarily asserts the Covenants.

505. A not-for-profit corporation formed in 1964 to protect "the Zoning Resolution of 1961" and to "defend and enforce" the Covenants does not, by announcing that purpose, acquire the benefit of a 1920 covenant.

506. BFHA has asserted that it has standing to enforce the Covenants as an association formed as a convenient instrument through which property owners advance their common interests.

507. BFHA has previously enforced a fencing covenant on that theory against a residential lot within its community.

508. *That standing theory* does not reach this case.

509. BFHA's prior enforcement concerned interior residential lots within BFHA's territory, not a commercial parcel on the far side of the boundary drawn on BFHA's own map.

510. Any substantial identification on which BFHA relies is an identification with the owners of the benefited lots BFHA represents.

511. BFHA has identified no member who owns land on the south side of Northern Boulevard that the Covenants were intended to benefit.

512. Associational standing, moreover, does not relieve BFHA of its burden to prove, by clear and convincing evidence, a common scheme encompassing the Property and the scope of the restriction as applied to it.

513. BFHA's prior enforcement matters involved setback or fence covenants on residential lots inside its own territory.

514. BFHA, by contrast, has disclaimed any representation of the land south of Northern Boulevard by excluding it from its own map.

515. By its own consultant's count, moreover, most of BFHA's members own no Covenant-burdened land.

516. Plaintiff pleads this cause of action consistently with the representative-capacity allegations concerning BFHA under "The Parties."

517. BFHA's representative standing is derivative: it rests on BFHA's identification with member owners of benefited land, not on any interest BFHA holds in its own name.

518. Plaintiff is entitled to a declaration that BFHA, in its own right, has no legal or equitable right to enforce the Covenants against the Property.

519. Plaintiff is further entitled to a declaration that any representative claim BFHA asserts is limited to members who own land the Covenants were intended to benefit and who could prove that benefit by clear and convincing evidence.

520. Plaintiff is further entitled to a declaration that BFHA and the members it represents are bound by the judgment in this action.

**AS AND FOR A TENTH CAUSE OF ACTION**
(New York State Human Rights Law, N.Y. Exec. Law § 296 — Discriminatory Effect and Intent — Against BFHA and the Ciccolillis)

521. Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth herein.

522. The New York State Human Rights Law provides that, in any case alleging housing discrimination, "an unlawful discriminatory practice may be established by a practice's discriminatory effect, even if such practice was not motivated by a discriminatory intent." N.Y. Exec. Law § 296(5-a)(a).

523. Under that statute, a practice has a discriminatory effect where it "actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, creed, color, national origin," or other protected characteristic. *Id.* § 296(5-a)(b).

524. A legally sufficient justification "shall be supported by evidence and may not be hypothetical or speculative." N.Y. Exec. Law § 296(5-a)(c)(2).

525. For the reasons alleged in Parts G and H and in the First Cause of Action, Defendants' enforcement of the Covenants against the Project has a discriminatory effect on Black and Hispanic households because of race, color, and national origin.

526. That enforcement is also motivated at least in part by discriminatory intent.

527. That enforcement constitutes an unlawful discriminatory practice under N.Y. Exec. Law § 296.

528. Plaintiff is entitled to a declaration that Defendants' enforcement of the Covenants against the Property and the Project would violate N.Y. Exec. Law § 296.

529. Plaintiff is further entitled to injunctive relief restraining such enforcement.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff demands judgment against Defendants as follows:

A. On the First Cause of Action, a declaration under 28 U.S.C. § 2201 and 42 U.S.C. § 3613 that enforcement of the covenants and restrictions recorded in Liber 2279, Page 316 against the Property and the Project by BFHA and the Ciccolillis would violate 42 U.S.C. § 3604(a), on both a disparate-impact and an intentional-discrimination theory, and a temporary, preliminary, and permanent injunction restraining such enforcement;

B. On the Second Cause of Action, a judgment under RPAPL 1951(2) adjudging that the Covenants are not enforceable by injunction against the Property (Block 5277, Lot 16) and are completely extinguished as to the Property, upon payment of such damages, if any, as the Court may determine;

C. On the Third, Fourth, Fifth, and Seventh Causes of Action, a declaration under 28 U.S.C. § 2201 that the Covenants are inapplicable to, abandoned and waived as to, and void and unenforceable against the Property, and that construction and use of the Project do not violate them;

D. On the Sixth Cause of Action, a judgment under RPAPL article 15 that Defendants, and all persons claiming under them, are forever barred from asserting any right, title, interest, or claim under the Covenants against the Property, and directing that the judgment be recorded against the Property in the Office of the City Register, Queens County;

E. On the Eighth Cause of Action, a declaration that the Ciccolillis, BFHA in its representative capacity, and the successors to the other parties to the 1960 Agreement have released and waived, and are estopped from enforcing, the Covenants' business-use restrictions against the Property;

F. On the Ninth Cause of Action, a declaration that BFHA has no right in its own name to enforce the Covenants against the Property, that any representative claim is limited to members owning benefited land, and that BFHA and its members are bound by the judgment;

G. On the Tenth Cause of Action, a declaration that enforcement of the Covenants against the Property and the Project by BFHA and the Ciccolillis would violate N.Y. Exec. Law § 296, and an injunction restraining such enforcement;

H. A permanent injunction restraining Defendants and their officers, members, agents, successors, assigns, and all persons acting in concert with them from enforcing or attempting to enforce the Covenants against the Property or the Project, and a declaration that the judgment binds BFHA's member lot owners through BFHA in

its representative capacity and, in the alternative, any defendant class the Court certifies under Fed. R. Civ. P. 23;

I. Reasonable attorneys' fees and costs under 42 U.S.C. § 3613(c)(2) and, to the extent available, N.Y. Exec. Law § 297(10), and the costs and disbursements of this action; and

J. Such other and further relief as the Court deems just and proper.

Dated: New York, New York
November 18, 2026

Respectfully Submitted,

**AKERMAN LLP**
*Attorneys for Plaintiff Northern 158 Holding LLC*

Michael T. Carr, Esq.

______________________________

Michael T. Carr, Esq.
Darryl R. Graham
1251 Avenue of the Americas, 37th Floor
New York, New York 10020
Tel: (212) 880-3800
michael.carr@akerman.com
darryl.graham@akerman.com